UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
BARLETTA HEAVY DIVISION, INC.    )
                                 )
         Plaintiff,              )    CIVIL ACTION NO.
                                 )    12-11193-DPW
                                 )
     v.                          )
                                 )
TRAVELERS INSURANCE COMPANY, INC. )
                                 )
         Defendant,              )
```

MEMORANDUM AND ORDER
October 25, 2013

## I. BACKGROUND

This case is the most recent in a series of vigorously contested lawsuits, in both state and federal court, arising from property damage occurring during the performance of repair and upgrade work on the Massachusetts Bay Transportation Authority's Red Line Station at Massachusetts General Hospital.

The plaintiff, Barletta Heavy Division, Inc., earlier filed lawsuits against a subcontractor, Layne Christensen Company, and Layne's insurer, Zurich American Insurance Company, seeking declaratory judgments affirming Zurich's obligation to defend Barletta as an additional insured under the insurance policy issued to Layne and for indemnification for the amounts paid to resolve claims by the owners of the damaged property. Following the conclusion of those suits and settlement of Barletta's claim for indemnification against its own insurer, Travelers Insurance Company, Inc., Barletta filed this lawsuit seeking reimbursement

-1-

from Travelers for attorneys' fees and costs incurred pursuing claims against Layne.  Both Barletta and Travelers have moved for summary judgment.

## A.    *Factual Background*

### 1.    The History of the Dispute and The Underlying Lawsuits

In 2003, Barletta Heavy Division, Inc. entered into a general contractor agreement with the MBTA to perform construction, repair, and upgrade work on the MBTA's Red Line Station at Massachusetts General Hospital.[1]  Barletta obtained an insurance policy from Charter Oak Fire Insurance Company, a subsidiary of Travelers.[2]

Meanwhile, in April 2003, Barletta entered into a construction subcontract with Layne, a drilling subcontractor hired by Barletta on the MBTA project.  Layne obtained an insurance policy from Zurich with a $2,000,000 limit and a $500,000 deductible (the "Zurich Policy").  Pursuant to the subcontract between Barletta and Layne, Layne named Barletta as

---

[1] I have described the factual background which underpins this dispute in *Barletta Heavy Division, Inc.* v. *Layne Christensen Co.*, 2011 WL 1399692 (D. Mass. Apr. 13, 2011).  I describe here only those facts necessary to understand and resolve the motions now before me.

[2] Although the insurance policy was issued by Charter Oak, rather than Travelers, both Travelers and Barletta treat Travelers as the proper party in interest.  To avoid confusion, in this memorandum I follow the convention of the parties and will refer to Travelers and the Travelers Policy as the insurer and policy that the are the subject of the dispute.

an additional insured under the Zurich Policy and provided a
certificate of insurance to Barletta.

In 2006, Layne commenced work on the MBTA project and, in
July of that year, Layne's drilling work resulted in damage to
property owned by the MBTA, and to nearby property at 3 Lindall
Place owned by Alan Lane and Richard Parella.  Barletta was
informed that month of the damages and the requests for payments
made by the MBTA and by Parella and Lane (the "Third-Party
Claims").  Barletta promptly notified Travelers about the Third-
Party Claims and, not later than the beginning of September 2006,
requested that Travelers pay for the damage.  Travelers did not
immediately pay for the damages.  Instead, Susan Lenling,
Travelers's claims representative, informed Barletta via email on
September 1, 2006 that Travelers does not "pay and chase" claims.
In that email, Ms. Lenling also informed Barletta that it would
assign counsel to a file a declaratory judgment action against
Layne and had contacted Attorney William Keville of Melick,
Porter & Shea ("MP&S") about handling the matter.  Travelers did,
in fact, retain MP&S on or about the same day.

The scope of MP&S's retention is the crux of the instant
dispute between Barletta and Travelers.  As noted above, on
September 1, 2006, Travelers said that it would retain counsel to
file a declaratory judgment action against Layne.  Travelers's
internal claim notes from September 5, 2006 indicate that

-3-

Travelers was prepared to assign counsel for a declaratory judgment action against both Layne and Zurich.  Those same notes indicate that on or about October 25, 2006 Ms. Lenling authorized MP&S to file a declaratory judgment action against Zurich.  That action was filed on November 13, 2006.  *Barletta Heavy Div., Inc. v. Zurich American Ins. Co.*, No. 06-01972 (Norfolk Cnty. Superior Ct.) (the "*Zurich* action").  In the *Zurich* action, Barletta sought a declaratory judgment that Zurich was obligated to defend and indemnify Barletta with respect to the Third-Party Claims and to assume the costs of Barletta's contribution claim against Layne.

In December 2006, Zurich's counsel raised the possibility of Zurich "tak[ing] over the defense of Barletta."  Ms. Lenling instructed MP&S to decline Zurich's offer to assume Barletta's defense.  Travelers has paid the costs and fees associated with the *Zurich* action and has not disputed those payments.

By early September 2006, the third-party claimants were pressing Barletta for a resolution.  Faced with this pressure and given the MBTA decision to withhold payment for Barletta's ongoing performance of the construction project, Barletta informed Travelers, on or about September 18, 2006, that it would be paying the Third-Party Claims.  Days later, Travelers provided Barletta draft release forms, which had been prepared by MP&S, for the Parella and Lane claim.  In November 2007, Barletta and

-4-

Travelers exchanged emails regarding a similar release for the MBTA claims.  Travelers later contended that it was not consulted prior to Barletta making these payments and did not consent to them.

In early 2007, following discussion and emails between Travelers and Mr. Keville, Mr. Keville sent a Mass. Gen. Laws c. 93A demand letter to Layne, copying both Travelers and Barletta, requesting that Layne indemnify Barletta for the payments of the Third-Party Claims.  Following Layne's refusal, MP&S filed suit on Barletta's behalf against Layne (the "*Layne* action") on September 18, 2007, approximately one year after the filing of the *Zurich* action.

Prior to filing the *Layne* action, Ms. Lenling and Mr. Keville both corresponded with Layne regarding indemnification of the Third-Party Claims.  Mr. Keville testified during his deposition that, while he recalled conversations with Ms. Lenling regarding whether to file the *Layne* action, he could not recall specifically being hired to do so by either Barletta or Travelers. Ms. Lenling, Travelers's representative, could not for her part recall how the discussions with Mr. Keville regarding filing a complaint against Layne concluded.  Barletta denies ever hiring MP&S to file the *Layne* action.

On November 30, 2007, Ms. Lenling wrote an email to Mr. Keville inquiring about the scope of MP&S's representation,

asking "[w]hen we filed the DJ[,] was it only against Zurich or did we Amend to add or change to Layne Geo?"  Mr. Keville responded explaining that two suits had been filed--one against Zurich and a separate suit against Layne.

Ms. Lenling's insurance claim notes report that she "did not authorize [the *Layne* action] to be filed nor did [she] agree to pay for this action."  Those same notes, however, also indicate confusion regarding who authorized filing the *Layne* complaint and who was to be responsible for the fees associated with MP&S's work on the *Layne* action.  According to those notes, on or about December 3, 2007, Mr. Keville and Ms. Lenling discussed the *Layne* action; Mr. Keville was reported to have "thought [Travelers was] paying the legal bills and sending them to the insured."

On December 12, 2007, Mr. Keville wrote an email to Ms. Lenling stating that Seta Kalaijian, Barletta's project manager, "understands that Barletta is responsible for the defense costs in the Federal case (Barletta v. Layne Christenson).  I will bill her directly."  No written confirmation of a conversation to that effect between Mr. Keville and Ms. Kalaijian regarding MP&S's attorneys' fees was sent to Ms. Kalaijian.  In her deposition, Ms. Kalaijian denied such a conversation ever took place, denies ever confirming that Barletta would assume responsibility for the fees associated with the *Layne* action, and testified that she did not have authority from Barletta to hire counsel or initiate

-6-

litigation.   Prior to January 2008, MP&S did not record the time
spent on the *Layne* and *Zurich* action on separate bills.

On August 5, 2008, Mr. Keville emailed Ms. Kalaijian
regarding the MP&S invoices for the *Layne* action, which had not
been paid by either Barletta or Travelers.   Although these
invoices date back to January 2008, Barletta denies receiving
them prior to August 2008.   After Ms. Kalaijian forwarded the
invoices to John Bulman, Barletta's general counsel, Mr. Bulman
requested a conference call with Travelers and MP&S.   During that
call, Mr. Bulman requested that Travelers pay the amounts of the
Third-Party Claims, requested that Travelers pay the fees from
the *Layne* action, and asked Mr. Keville why MP&S had not sent an
engagement letter for the *Layne* action to Barletta.   Mr. Bulman
also requested all correspondence or written proof from Mr.
Keville regarding the assertion that Ms. Kalaijian authorized
filing the *Layne* action and agreed to pay bills for MP&S.

On October 3, 2008, Travelers's counsel, John Graceffa, sent
a letter to Mr. Bulman regarding Travelers's coverage position.
The Travelers position, as set forth in that letter, was, first,
that Layne and Zurich were acting as the primary insurers of
Barletta (which was an additional insured pursuant to the
Barletta-Layne subcontract) and that Travelers insurance stood in
excess of that primary insurance.   Second, that Barletta was not
liable for the damages, which were caused by Layne, and,

therefore, Travelers owed no duty to indemnify Barletta.   Third, that Barletta may have breached the terms of the Travelers's Policy by making voluntary payments of the Third-Party Claims. And, fourth, that Travelers would await the outcome of Barletta's motion for summary judgment in the *Layne* action before taking further steps related to the Third-Party claims.

As of December 2008, MP&S had not been paid for the work it performed on the *Layne* action and filed a motion to withdraw from that case.   In that motion, MP&S asserted that "Barletta retained MP&S to pursue this claim against Layne Christensen Company." Later that month, Barletta, through its counsel Mr. Bulman, agreed to pay MP&S's fees and MP&S withdrew its motion to withdraw from the *Layne* action.   Barletta contends that it agreed to pay these bills and continue to retain MP&S as counsel only because such a course appeared most expedient from that point forward and was necessary to mitigate the risk posed by the litigation with Layne and, in particular, the counterclaims filed by Layne.

A jury trial was held before me in the *Layne* action in October 2009.   The jury returned a special verdict, finding that, with respect to the MBTA's claims, Layne was negligent, but that its negligence was not a substantial contributing factor in the damage to the MBTA's property.   With respect to the Lane and Parella claims, the jury determined that Layne's drilling

-8-

operations were the cause of the damage to their Lindall Place property, but found that Layne had not been negligent in connection with that damage.  I rejected Barletta's post-trial motions to set aside the jury verdict and held that Layne had no obligation to defend Barletta against the Third-Party Claims or to reimburse Barletta for the costs of defending against and settling those claims.  *Barletta v. Layne*, 2011 WL 1399692 (D. Mass. April 13, 2011).

In reliance upon the verdict in favor of Layne in the *Layne* action, the Massachusetts Superior Court overseeing the *Zurich* action determined that the Third-Party Claims were excluded from the coverage of the Zurich Policy and that Zurich was not required to indemnify Barletta for the costs of the settlements with the MBTA, Parella, and Lane.  *Barletta Heavy Div., Inc.* v. *Zurich American Ins. Co.*, No. 09-01972, at *6-9 (Norfolk Cnty. Super. Ct. Mar. 15, 2010).  The Superior Court, however, determined that Zurich did have a duty to defend Barletta with respect to the Third-Party Claims because they arose out of Layne's work.  *Id.* at 9-12.  However, the Court concluded that the limited duty to defend did not encompass a duty to assume the costs of Barletta's action for indemnification against *Layne*. *Id.* at 11-12.

Following the Superior Court summary judgment determination, but before final judgment entered in that matter, Barletta agreed

to settle its claim against Zurich for $200,000, and Barletta's
claim for defense costs was dismissed pursuant to a joint
stipulation.  Barletta also reached a settlement with Travelers,
under which Travelers agreed to pay Barletta $300,000 in exchange
for Barletta's release of claims for indemnification for the
amounts paid to settle the Third-Party Claims.  That release,
however, expressly did not resolve the Barletta claims against
Travelers for reimbursement of the costs incurred pursuing the
*Layne* action.  Barletta now seeks reimbursement from Travelers
for the amounts expended pursuing the litigation against Layne.

   2.   The Terms of the Travelers's Policy

        The Travelers Policy sets forth the scope of Travelers's
coverage and its duty to defend Barletta against claims.  It
provides that Travelers:

> will pay those sums that the insured becomes legally
> obligated to pay as damages because of "bodily injury"
> or "property damage" to which this insurance applies.
> [Travelers] will have the right and duty to defend the
> insured against any "suit" seeking those damages.
> However, [Travelers] will have no duty to defend the
> insured against any "suit" seeking damages for "bodily
> injury" or "property damage" to which this insurance
> does not apply. [Travelers] may, at [its] discretion,
> investigate any "occurrence" and settle any claim or
> "suit" that may result.

Travelers Policy, Commercial General Liability Coverage Form, §
1.a.  In addition, the policy requires Travelers to pay for
"[a]ll reasonable expenses incurred by the insured at our request
to assist us in the investigation or defense of the claim or

-10-

'suit.'" Travelers Policy, Deductible Liability Insurance, §
G.e.(3).

Under the Travelers Policy, the insured, Barletta, is
prohibited from making any payments or assuming any contractual
obligation regarding a claim without obtaining the consent of
Travelers:

> No insured will, except at the insured's own cost,
> voluntarily make a payment, assume any obligation, or
> incur any expense . . . without [Travelers's] consent.

Travelers Policy, Commercial General Liability Coverage Form, §
IV(2)(d). That agreement also transfers from Barletta to
Travelers the right to recover payments made by Travelers under
the insurance policy:

> If the insured has rights to recover all or part of any
> payment we have made under this Coverage Part, those
> rights are transferred to us. The insured must do
> nothing after loss to impair them.  At our request, the
> insured will bring "suit" or transfer those rights to
> us and help us enforce them.

*Id.* at § IV(8).

### 3.    Barletta's Expert Report

In support of its claims, Barletta has submitted an expert
report authored by David Turteltaub.  For close to 40 years,
Turteltaub has worked as a insurance claims professional,
including as a claims representative and a claims adjuster.
Based upon his experience in the insurance field, he offers a
range of opinions regarding Travelers's response to the third-
party claims by the MBTA, Lane and Parella.

Mr. Turteltaub's opinions can be divided roughly into two categories.  The first category includes Mr. Turteltaub's criticism of Travelers's investigation and response to Barletta's notice of the third-party claims.  Mr. Turteltaub criticizes Ms. Lenling for her handling and investigation of the claims, including her failure to contact witnesses and her failure to review and become familiar with the relevant terms of the Zurich policy and Layne subcontract. Mr. Turteltaub opines that, if the Third-Party Claims had been investigated and handled properly, "proper, prudent and reasonable adjusting practices would have compelled that Travelers pay the MBTA, Lane and Parella claims when presented."

The second category relates to Travelers's handling of the work performed by MP&S.  Mr. Turteltaub faults Travelers and Ms. Lenling for failing to provide clear instructions to MP&S regarding the filing of declaratory judgment actions against Zurich and/or Layne, and for failing to institute appropriate reporting requirements and billing procedures.  As a result of these failures, according to Mr. Turteltaub, "[MP&S] believed that their actions in filing the [*Layne* action] was approved[,] authorized and to be paid for by Travelers."

As discussed further below, Travelers has moved to strike the Turteltaub Report, contending that it is both irrelevant and unreliable.

B.    *Procedural Background*

Barletta initially filed the instant complaint against Travelers in Massachusetts Superior Court on March 29, 2012 and served it upon Travelers June 4, 2012. The complaint asserted four counts: (i) Fraud and Deceit (Count I); (ii) Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II); (iii) Breach of Contract (Count III); and (iv) Breach of Mass. Gen. Laws c. 93A (Court IV).  On July 2, 2012, Travelers removed the case to this court pursuant to 28 U.S.C. 1446(a).  On October 2, 2012, I granted Travelers's motion to dismiss Count I of Barletta's complaint.

After the close of discovery, Barletta moved to amend its complaint.  Although the proposed amended complaint did not add or drop any counts (aside from removing the dismissed claim for fraud and deceit), it would have augmented Barletta's legal theory substantially by adding allegations that Barletta failed to investigate adequately the claims made by the MBTA, Parella, and Lane against Barletta, and that, had Travelers properly and competently investigated these incidents, Travelers would have promptly paid the claims.  Following a hearing, I denied Barletta's motion to amend on April 25, 2013.

Currently, there are three motions pending before me.  At the threshold Travelers has moved to strike the Turteltaub Report.  Barletta has moved for summary judgment on its three

-13-

remaining claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Mass. Gen. Laws c. 93A.  Travelers has filed a cross motion for summary judgment on each of Barletta's claims.  The motions are addressed in turn.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp*. v. *Catrett*, 477 U.S. 317, 322 (1986).  The question is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Casas Office Machines, Inc*. v. *Mita Copystar Am., Inc*., 42 F.3d 668, 684 (1st Cir. 1994).

Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *See Adria Int'l Group, Inc*. v. *Ferre Dev., Inc*., 241 F.3d 103 (1st Cir. 2001); *Wightman* v. *Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996). Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing inferences against each

movant in turn.  *Reich* v. *John Alden Life Ins. Co.*, 126 F.3d 1, 6

(1st Cir. 1997).

### III. ANALYSIS

#### A.  *Motion to Strike the Turteltaub Report*

Travelers's motion to strike the Turteltaub Report seeks to

prevent its use in connection with the cross-motions for summary

judgment and ultimately, if it comes to that, as a basis for

trial testimony.  Consequently, I must determine whether the

expert testimony proffered by Barletta is sufficiently reliable

to be admitted under Fed. R. Evid. 702, which provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify
> in the form of an opinion or otherwise if: (a) the
> expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

The Supreme Court has offered guidance regarding the Rule in

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), and subsequent cases, *Gen. Elec. Co.* v. *Joiner*, 522 U.S.

136 (1997) and *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137

(1999).

*Daubert* teaches that judges measure the admissibility of

expert testimony by such considerations as:

> (1) whether the theory or technique can be and has been
> tested; (2) whether the technique has been subject to peer

review and publication; (3) the technique's known or
potential rate of error; and (4) the level of the theory or
technique's acceptance within the relevant discipline.

*United States* v. *Mooney*, 315 F.3d 54, 62 (1st Cir. 2002) (citing
*Daubert*, 509 U.S. at 593-94).  As the Supreme Court's decision in
*Kumho Tire* makes clear, these factors apply not only to
"scientific" testimony, but may be applied, as appropriate, to
expert opinion based upon technical or other specialized
knowledge.  526 U.S. at 141-142.  Opinions based upon
"experiental" expertise, such as those presented in the
Turteltaub Report may be excluded if they "fail[] to satisfy
either *Daubert*'s factors or *any other* set of reasonable
reliability criteria." *Kumho Tire*, 526 U.S. at 139 (emphasis in
original).  When making the determination whether to exclude the
opinion of an expert, I must focus on the "principles and
methodology" employed by an expert. *Daubert* 509 U.S. at 595.
That said, "conclusions and methodology are not entirely distinct
from one another," and I may exclude opinion evidence when "there
is simply too great an analytical gap between the data and the
opinion proffered." *Joiner*, 522 U.S. at 146.

The parties appear to have reached an agreement--though it
has not been reduced to writing or filed as a stipulation with
this Court--that Barletta will not rely on those portions of the
Turteltaub Report that relate only to claims in Barletta's
proposed (but rejected) amended complaint.  Even if the parties

-16-

had not reached such an agreement, I would reach the same conclusion.   To be admissible, expert testimony must be "helpful to the trier of fact" which requires that the opinions be "relevant to the facts of the case." *Bogosian* v. *Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997).   Opinions which relate only to claims that have been dismissed or are not before the Court are irrelevant.   As discussed above, I previously denied Barletta motion to amend its complaint to add allegations regarding Travelers's investigation and decision not to pay Barletta's claims.   Evidence and opinions relating to the excluded allegations are irrelevant.   Accordingly, I conclude that Travelers's motion to strike should be granted with respect to those of Mr. Turteltaub's opinions which deal with Travelers's purportedly substandard investigation of the Third-Party Claims and its decision not to indemnify Barletta for those claims.

I next turn to those portions of the Turteltaub Report which deal with Travelers's retention and direction of MP&S as counsel for Barletta.   Mr. Turteltaub contends that Travelers failed properly to document and instruct MP&S regarding the scope of its representation of Barletta, and that this failure resulted in confusion regarding the engagement of MP&S, the filing and pursuit of the *Layne* action without proper authorization, and the accrual of the substantial attorneys' fees that are the subject of this dispute.   This second category of opinions is plainly

relevant to--indeed at the heart of--this case.  I must determine, therefore, whether Mr. Turteltaub's opinions regarding this topic satisfy the gatekeeping requirements imposed by Federal Rule of Evidence 702.  I conclude that Mr. Turteltaub's opinions do not do so for two reasons.

First, *Daubert* identifies four criteria against which judges may measure the admissibility of expert testimony.  Mr. Turteltaub's opinions satisfies none of these criteria nor does it possess any similar indicia of reliability.  Nothing in Turteltaub's Report suggests that his theories and principles have been tested in any rigorous way, that his theories have been subjected to any peer review, or that his ideas have any acceptance within the relevant discipline.  Indeed, he has provided no basis for the validity of his opinions beyond his own say-so.  Mr. Turteltaub has not identified any insurance manuals, industry publications or any other sources in support of his opinion.  He has pointed to no objective sources for his opinions nor identified any definable set of insurance industry "best-practices" against which he measures Travelers's conduct.  The "failure to satisfy either *Daubert*'s factors or *any other* set of reasonable reliability criteria" renders the Turteltaub Report inadmissible.  *Kumho Tire*, 526 U.S. at 139.

Second, even if Mr. Turteltaub had offered sufficiently reliable opinions regarding insurance industry standards and

-18-

best-practices, I would nevertheless conclude that Mr. Turteltaub has not offered a reliable opinion connecting the proper standards for insurance industry conduct, the facts of this case, and his ultimate conclusions.   Instead, he offers a series of unanchored conclusions, e.g., "The filing of [the *Layne* action] was directly caused by Ms. Lenling giving [MP&S] unclear and nonspecific instructions"; "Travelers engaged [MP&S] in a vague manner without clear instruction and direction.   This is not proper, fair or prudent claims handling practices [sic]." Barletta argues that Mr. Turteltaub's opinions are "imperative to help the jury better understand the intricacies and common practices of the insurance industry in how attorneys are assigned cases and . . . how attorneys understand the scope of their task."   However, meaningful information regarding the intricacies and common practices of the insurance industry is precisely what the Turteltaub Report lacks, offering instead barebones conclusions regarding ultimate facts for the jury to decide. Opinions which are connected to factual data only by the "*ipse dixit*" of an expert are inadmissible.   *Joiner*, 522 U.S. at 146.

I therefore conclude that none of the opinions offered by Barletta's expert witness, David Turteltaub, are admissible, and will grant in full Travelers's motion to strike his report.

**B.** *The Barletta Motion for Summary Judgment*

    1.   <u>Breach of Contract and Breach of the Covenant of Good</u>
       <u>Faith and Fair Dealing</u>

The crucial factual disputes in this case revolve around whether Travelers authorized or instructed MP&S to pursue a declaratory judgment action against Layne as part of the overall strategy for defending/seeking reimbursement for the Third-Party Claims, or whether those claims were filed based upon Barletta's authorization and agreement to assume responsibility for the fees incurred in the *Layne* action from the outset.

For purposes of the Barletta motion for summary judgment, I assume that the latter is the true state of affairs.  Under those assumed facts, I must determine whether the Travelers Policy requires Travelers to bear the costs of a declaratory judgment action against Layne that can be said to have been filed voluntarily by Barletta.  It is well settled that "the rules governing the interpretation of insurance contracts are the same as those governing the interpretation of any contracts." *Sullivan* v. *Southland Life Ins. Co.*, 854 N.E.2d 138, 141 (Mass. App. 2006) (internal citation and quotation marks omitted). However, "if the [insurance] contract is ambiguous, doubts as to the meanings of the words must be resolved against the insurance company that employed them and in favor of the insured." *Boazova* v. *Safety Ins. Co.*, 968 N.E.2d 386, 390 (Mass. 2012).

Two provisions of the Travelers Policy relate to Travelers's potential obligation to pay for Barletta's litigation costs.  The first imposes upon Travelers a "duty to defend" against any "suit" seeking damages for bodily injury or property damage to which this insurance applies.  *See* Travelers Policy, Commercial General Liability Coverage Form, § 1.a.  The Massachusetts Supreme Judicial Court has held that an insured is entitled to reimbursement of attorneys' fees incurred in successfully establishing an *insurer's* obligation to defend against claims. *See Hanover Ins. Co.* v. *Golden*, 766 N.E.2d 838, 840-41 (Mass. 2002); *Preferred Mut. Ins. Co.* v. *Gamache*, 686 N.E.2d 989 (Mass. 1997).  More generally, the Supreme Judicial Court has explained that "[t]he intent of an insured in acquiring liability insurance is to transfer to the insurer the responsibility for defending the insured against any claim which may fall within the coverage of the policy" and that liability insurance "is 'litigation insurance' as well."  *Rubenstein* v. *Royal Ins. Co. of America*, 708 N.E.2d 639, 642 (Mass. 1999).

Nevertheless, there are limits to the insurer's obligation. The Travelers Policy explicitly speaks only of Travelers's "duty to defend," which suggests that this is limited to "defending" against claims and does not encompass lawsuits launched offensively.  In the *Zurich* action, when faced with the question of whether the Zurich Policy's similar duty to defend encompassed

a duty to reimburse Barletta for the costs of Barletta's offensive litigation against Layne, Justice Connor of the Massachusetts Superior Court answered in the negative.  He explained:

> Barletta has not cited any Massachusetts case analogous to its own, where our courts found that an insurer's duty to defend encompassed the costs of a contribution claim voluntarily filed by the insured.  I decline to create such a rule in this matter.  Therefore, although Zurich had a duty to defend Barletta from the claims of Parella, Lane, and the MBTA, that duty did not include the litigation costs of the [*Layne* action].

*Barletta Heavy Div., Inc.* v. *Zurich American Ins. Co.*, No. 09-01972, at *11-12.

Like the Massachusetts Superior Court, I am unaware of any decision in which a court has extended an insurer's duty to defend to encompass offensive suits undertaken voluntarily.[3] Moreover, I am of the view that the Supreme Judicial Court's decision in *Wilkinson* v. *Citation Ins. Co.*, 856 N.E.2d 829, 834-835 (Mass. 2006), which declined to include fees incurred in pursuit of *indemnification* from an insurer having a duty to

---

[3] The Superior Court's decision in *Barletta Heavy Div., Inc.* v. *Zurich American Ins. Co.*, No. 09-01972, discusses *Wasserman* v. *Commerce Ins. Co.*, 2002 WL 31187681 (Mass. Super. 2002).  I share the view of Justice Connor that *Wasserman* is properly limited to the unique setting of a Notice of Responsibility issued by the Massachusetts Department of Environmental Protection, which imposes affirmative obligations upon the plaintiff to pursue potentially responsible parties, *id.* at 11, and consequently, I decline to extend the holding of that case to create a broader rule requiring an insurer to reimburse the costs of offensive litigation voluntarily launched by the insured.

defend signals an intent to limit recovery to encompass only litigation costs incurred in a suit against an insurer that successfully establishes an insurer's duty to defend.

Finally, there are good policy reasons for declining to extend the coverage of an insurer's duty to defend to voluntary suits initiated by the insured.  To do so would risk spawning marginal litigation; an insured would have every incentive – and little disincentive – to file suit, knowing that it could reap the benefits of success – however unlikely – while transferring the costs of an otherwise predictably unsuccessful suit onto its insurer.  I am not inclined to adopt a rule that creates such misaligned incentives.  Unaware of any precedent extending an insurance contract's duty to defend provision to encompass voluntary offensive litigation initiated by the insured, and wary of the consequences of doing so, I decline to extend the duty to defend obligation in the Travelers Policy to cover Barletta's offensive suit against Layne.

The second pertinent provision of the Travelers policy transfers from Barletta to Travelers the right to recover any payment made under the policy and requires the insured to assist Travelers in enforcing such a right.  Travelers Policy, Commercial General Liability Coverage Form, § IV(2)(d) ("If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us

-23-

. . . At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them."). This provision appears to grant Travelers the right--but clearly does not create the obligation--to launch offensive litigation to recoup damages covered by the insurance policy. Nothing in this provision mandates that Travelers assume the burden and costs of offensive litigation undertaken voluntarily by Barletta without Travelers's authorization or direction. Moreover, that provision explicitly speaks to the transfer of the right to recover any payment *Travelers* has made under the insurance contract. Payments made by the *insured*, rather than *Travelers*, fall outside the scope of this provision.

Finally, Barletta contends that Travelers violated its insurance obligations by wrongfully delaying the indemnification of Barletta until the resolution of the Barletta lawsuits with Zurich and Layne and by rejecting Zurich's offer of a defense. As both the Justice Connor and I recognized in dealing with Barletta's suits, there was a good faith basis for the contention that Layne and Zurich (and therefore not Travelers) were required to indemnify Barletta for the damage to the third-party claimants. Moreover, Travelers did, in fact, bear the cost of refusing Zurich's offer of a defense by itself pursuing and funding the declaratory judgment action against Zurich. If, as I must assume for purposes of evaluating Barletta's motion, the

*Layne* action was initiated by Barletta not Zurich, this is evidence of Barletta's own belief that Layne, and not Travelers, would be the responsible party.  Accordingly, this does not suggest that Travelers's decisions or conduct in this regard were made in anything but good faith.

When all factual disputes and inferences are assumed in favor of Travelers, I am led to the unavoidable conclusion that Barletta cannot show as a matter of law that Travelers breached its contractual obligations, express or implied, by refusing to reimburse Barletta for the fees and costs incurred in pursuit of the *Layne* action.

### 2.   Mass. Gen. Laws c. 93A

Barletta's motion for summary judgment on its Mass. Gen. Laws. c. 93A claim must be denied for much the same reasons. Chapter 93A prohibits the employment of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  The provision protects an insured from unfair and bad faith conduct on behalf of an insurer. "[A] mere breach of contract," however, "without more does not constitute an unfair or deceptive act or practice." *Incase, Inc*. v. *Timex Corp.*, 421 F. Supp. 2d 226, 239 (D. Mass. 2006) (internal citations and quotation marks omitted).  *See also, e.g., Spence* v. *Berkshire Life Ins. Co.*, 561 F. Supp. 2d 126, 130-131 (D. Mass. 2008) (A good faith dispute regarding the

-25-

meaning of the terms of a contract does not rise to the level of a 93A violation); *Duclersaint* v. *Fed. National Mortgage Ass'n*, 696 N.E.2d 536, 540 (Mass. 1998) (same).

Having already determined that, on this record, I cannot conclude as a matter of law that Travelers's conduct amounts to a breach of contract, I likewise conclude that the evidence proves no more than a good faith dispute over the terms of an insurance agreement and so does not amount to a breach of Mass. Gen. Laws c. 93A.

**C.   *The Travelers Motion for Summary Judgment***

 **1.   Application of Collateral Estoppel to Barletta's Claims**

Travelers contends that the Massachusetts Superior Court's decision in the *Zurich* action estops Barletta from asserting any claim to recover the attorneys' fees incurred in prosecuting the *Layne* action.

The doctrine of collateral estoppel, or issue preclusion, prevents relitigation by a party of issues determined adversely to that party in an earlier action.  The requirements for collateral estoppel are that:

> (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Additionally the issue decided in the prior adjudication must have been essential to the earlier judgment.

*In re Sonus Networks, Inc.*, 499 F.3d 47 (1st Cir. 2007) (citation

omitted).  *See also Miles* v. *Aetna Cas. and Surety Co.*, 589 N.E.2d
314, 317 (Mass. 1992) ("[T]he doctrine of collateral estoppel,
also known as issue preclusion, does not require mutuality of
parties, so long as there is an identity of issues, a finding
adverse to the party against whom it is being asserted, and a
judgment by a court or tribunal of competent jurisdiction.").  In
the *Zurich* action, the Massachusetts Superior Court entered
partial summary judgment against Barletta with respect to its
claims for recoupment from Zurich of the costs of its lawsuit
against Layne, *Barletta Heavy Div., Inc.* v. *Zurich American Ins.
Co.*, No. 09-01972, at *12.  Barletta was unquestionably a party
to this prior adjudication, satisfying the second prong of the
test for collateral estoppel.  In addition, the Superior Court's
determination that Zurich's duty to defend Barletta under the
Zurich Policy issued to Layne did not require reimbursement of
the cost of a contribution claim voluntarily filed by Barletta
against Layne was undeniably essential to the judgment of that
Court.  *Id.* at *11-12.

Given the identity of critical language in the Comprehensive
General Liability policies of both Zurich and Travelers, certain
of the issues decided by the Superior Court in *Barletta* v. *Zurich*
can be said to be identical to the issues presented in this
action.  Travelers, however, stumbles at the threshold because

the Superior Court never issued a "final judgment" to support application of collateral estoppel.

The Superior Court entered an order granting-in-part and denying-in-part Barletta's motion for summary judgment in the *Zurich* action on March 15, 2010.  On May 20, 2010, the Superior Court entered partial summary judgment in favor of Zurich and the parties entered into a stipulation dismissing the case the same day.  No final judgment was entered.  Although "final judgment in the traditional sense" may not be "not essential to the applicability of issue preclusion," the Massachusetts Supreme Judicial Court has held that where there is no appealable judgment or interlocutory order, there would need to exist "special circumstances to justify the imposition of issue preclusion."  *Tausevich* v. *Board of Appeals of Stoughton*, 521 N.E.2d 385, 387 (Mass. 1988).

There are no special circumstances here where the issues were disposed of by settlement following entry of an unappealable interlocutory order in the *Zurich* action.  Consequently, I will not apply collateral estoppel to the question of the scope of Travelers' duty to defend under its insurance policy with Barletta.  As is evident from this Memorandum and Order, I find the Superior Court's views of this question persuasive.  Nevertheless, as a matter of law, those views are not made

prescriptive through the application of the doctrine of collateral estoppel.

   2.   Breach of Contract and Breach of the Covenant of
        Good Faith and Fair Dealing.

When determinating whether to grant the Travelers motion for summary judgment, I view the facts in the light most favorable to Barletta and render all credibility determinations in Barletta's favor.  Doing so, I find that upon receiving notice of the Third-Party Claims, Susan Lenling, Travelers's representative, informed Seta Kalaijian on September 1, 2006 that while Travelers would not "pay and chase"--i.e. pay the claims and seek reimbursement from responsible parties--she also told Ms. Kalaijian that Travelers was prepared to hire counsel on Barletta's behalf to pursue declaratory judgment actions against parties responsible for indemnifying Barletta.  Ms. Lenling specifically indicated that Travelers would assign counsel to file a declaratory judgment action against Layne and had contacted Mr. Keville of MP&S about doing so.

Travelers' contemporaneous internal notes indicate Ms. Lenling had received internal authorization from Travelers to pursue claims against both Zurich and Layne.  Subsequently, MP&S filed a declaratory judgment action against Zurich in Massachusetts Superior Court.  MP&S did not immediately file a complaint against Layne, but instead wrote a Massachusetts Gen. Laws. c. 93A demand letter requesting Layne reimburse Barletta

for the amounts paid to resolve the Third-Party Claims.  Both
Travelers and Barletta were copied on this demand letter.  In the
fall of 2007, after Layne refused to indemnify Barletta, MP&S
filed the *Layne* action.  Barletta did not authorize the filing of
that suit, nor did anyone from Barletta agree at that time (or
any time prior to December 2008) to pay the attorneys' fees for
the *Layne* action.  To the contrary, MP&S believed that Travelers
would pay the fees for the *Layne* action--as it had been doing for
the *Zurich* action--and, consistent with that understanding, MP&S
did not create a separate bill for the *Layne* action until
directed to do so by Travelers.

No later than the end of November 2007, however, Travelers
told Mr. Keville that it would not be responsible for the fees
for the *Layne* action.  Despite the fact that Mr. Keville had
informed Travelers that Barletta had authorized the *Layne* action
and agreed to pay MP&S's fees associated with that lawsuit,
Barletta had not authorized the suit nor assumed responsibility
for paying MP&S's fees.  Rather, the first time Barletta became
aware that MP&S would look to it for payment was August 2008,
when MP&S sent Ms. Kalaijian its invoices for the past eight
months.  In December 2008, Barletta, through its counsel, Mr.
Bulman, agreed to pay a portion of MP&S's past due invoices and
its fees going foward.  Mr. Bulman felt compelled to do so,
however, as a necessary step to mitigate the risk posed by the

ongoing and, by then, highly contentious litigation--including Layne's counterclaims.

Based upon the above set of events, a reasonable fact-finder could infer that Travelers engaged MP&S to pursue claims on Barletta's behalf against *both* Zurich and Layne.  That engagement lasted until the end of November 2007 when Travelers informed MP&S that its engagement was limited to the *Zurich* action, and that Travelers would not be responsible for the fees from the *Layne* action.  Under this factual construct, Travelers is undoubtedly responsible for MP&S's fees through November 2007.

Barletta, however, was only informed that MP&S would look to it for payment of the *Layne* action fees in August 2008.  At that point, Barletta was faced with a decision about whether to continue to engage MP&S or terminate the engagement.  Barletta elected to continue the engagement, reflecting Barletta's determination that this was the most expedient course forward. The question is whether Travelers remained responsible for MP&S's fees past that point.

I see nothing in the Travelers's Policy which obligates Travelers to assume the cost of offensive litigation.  As discussed above, the duty to defend provision is limited to defensive litigation--responding to affirmative claims made against the insured--and does not encompass litigation pursued by the insured against third-parties.  *See New England Insulation*

*Co., Inc.* v. *Liberty Mut. Ins. Co.*, 2009 WL 817812 (Mass. App. 2009) (unpublished disposition) (insurance policy' duty to defend and duty to indemnify provisions did not require insurer to pursue third party contribution claim).  Other provisions in the contract are equally unavailing.  While Travelers is obligated to pay "[a]ll reasonable expenses incurred by the insured *at our request* to assist us in the investigation or defense of the claim or 'suit,'" such a provision is plainly inapplicable here, where Travelers has made no such request and, in fact, withdrew its authorization for the *Layne* action.  Similarly, the policy's subrogation clause, which provides that "[i]f the insured has rights to recover all or part of any payment [Travelers has] made under this Coverage Part, those rights are transferred to [Travelers]" does not create any affirmative obligation to pursue litigation and by its own terms is limited to suits seeking to recover payments made by Travelers.

Barletta contends that its decision to continue to engage MP&S in December 2008 was a necessary means of mitigating harm caused by Travelers's conduct.  The most that can be said, however, is that Barletta was placed in a difficult position by virtue of a business decision made by Travelers.  If Travelers directed MP&S to initiate litigation against Layne on Barletta's behalf, that (like the decision to pursue litigation against Zurich) was a business decision made at Travelers's discretion--

-32-

not a contractual obligation.  Reversing course and deciding not
to pursue that litigation after November 2007 was likewise a
business decision.  Absent a breach of a contractual obligation,
the mere fact that these decisions placed Barletta in admittedly
difficult circumstances does not make Travelers liable for any
harm which may result or for the costs of mitigating any risk
Barletta may face.  Simply put, Travelers had no legal obligation
to pursue claims against Layne and so its decision to cease that
pursuit does not violate any legal duty.

In addition to asserting a breach of the explicit terms of
the insurance contract, Barletta also invokes the covenant of
good faith and fair dealing which is implied in all Massachusetts
contracts.  *See UNO Restaurants, Inc.* v. *Boston Kenmore Realty
Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).  That implied covenant
requires a party to "remain faithful to the intended and agreed
expectations of the parties in their performance" *id.* at 964, and
prohibits a party from engaging in conduct that "will have the
effect of destroying or injuring the rights of the other party to
receive the fruits of the contract." *Anthony's Pier Four*, 583
N.E.2d at 820 (internal citations and quotation marks omitted).
The implied covenant, however, "may not . . . be invoked to
create rights and duties not otherwise provided for in the
existing contractual relationship." *UNO Restaurants*, 805 N.E.2d
at 964.  As described above, the Travelers Policy does not impose

-33-

upon Travelers any duty to pursue affirmative claims on behalf of
an insured.   Such an obligation cannot be created out of whole
cloth by invoking the implied covenant of good faith and fair
dealing.  *See New England Insulation Co., Inc.*, 2009 WL 817812 at
*3 ("[Insurer] had no duty to pursue [third-party contribution
claims].   Refusing to do something that one has no duty to do
cannot constitute bad faith.").

   Because there is a genuine issue of material fact regarding
whether Travelers engaged MP&S and is responsible for the fees
for the *Layne* action through November 2007, I will deny the
Travelers motion for summary judgment.   However, as set forth
above, Barletta will be limited to seeking only repayment of fees
for work performed before Travelers informed MP&S that it would
no longer pay the attorneys' fees for the *Layne* action.

   2.  Mass. Gen. Laws. c. 93a

   As a preliminary matter relating to Barletta's Chapter 93A
claim, I first must address the relationship between Chapter 93A
and Massachusetts General Law c. 176D, which makes unlawful
certain unfair insurance settlement practices.   Section 9 of
Chapter 93A expressly allows a plaintiff bringing suit under that
section to bring an action against persons violating Mass. Gen.
Laws c. 176D, § 3, cl. 9, as well as against persons violating
Mass. Gen. Laws c. 93A, § 2.   Mass. Gen. Laws ch. 93A, § 9(1).
Because of this explicit authorization, a Section 9 plaintiff

"may recover for violations of G.L. c. 176D, § 3, cl. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2." *Polaroid Corp*. v. *Travelers Indem. Co.*, 414 Mass. 747, 754 (1993).

The same, however, does not hold true for an entity engaged in "trade and commerce" which may sue only under Section 11 of Chapter 93A. For such a plaintiff, a violation of Chapter 176D does not, *per se*, provide for liability under Chapter 93A. "[A] violation of chapter 176D does not automatically violate [Chapter 93A] § 2." *F.C.I. Realty Trust* v. *Aetna Cas. & Sur. Co.*, 906 F.Supp. 30, 32 n. 1 (D. Mass. 1995). This is not to say that Barletta cannot prove a Chapter 93A claim based upon conduct which would also violate Chapter 176D, but rather that the question is whether the complained of conduct is unfair and deceptive under Mass. Gen. Laws c. 93A, § 2--and not whether Travelers's conduct constituted an unfair settlement practice under Chapter 176D.

As explained above, a good faith dispute regarding contractual liability does not generate an unfair and deceptive practice and so does not rise to the level a Chapter 93A violation. *Duclersaint*, 696 N.E.2d at 540. Rather, "in order for a 93A claim to succeed, the law requires more than a mistake or honest dispute concerning a contract . . . Some level of bad faith must be present." *Ecological Fibers, Inc.* v. *Kappa Graphic*

-35-

*Bd., B.V.*, 345 F. Supp. 2d 13, 15 (D. Mass. 2004) (internal citations omitted).  Travelers has made business decisions which did not violate any contractual obligations and were within its permissible discretion.  A refusal to undertake something that a party has no duty to do does not constitute bad faith.  *New England Insulation Co., Inc.*, 2009 WL 817812 at *3.  Although these business decisions may seem to Barletta to be hard edged, they are not unlawful nor were they unfair and deceptive.  Accordingly, I will grant Travelers's motion for summary judgment on Barletta's Chapter 93A claim.

## IV.   CONCLUSION

For the reasons set forth more fully above, defendant's motion to strike the expert report of David Turteltaub is GRANTED.  Plaintiff's motion for summary judgment is DENIED.  Defendant's motion for summary judgment is GRANTED as to Counts II and III, except as to the fees and expenses incurred prior to the end of November 2007, as to which it is DENIED, and GRANTED as to Count IV.  The parties shall file, on or before November 4, 2013, a joint submission proposing means for reducing this case to final judgment.  A scheduling conference shall be held at 9:30 AM on Friday, November 8, 2013 to address the final resolution of this matter.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE